# EXHIBIT "1"

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
**WELLS FARGO NATIONAL ASSOCIATION, WELLS FARGO & COMPANY,
and DOES 1-50,**

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
**LAVONNE ATKINS**

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | **CASE NUMBER** *(Número del Caso):* |
|---|---|

**San Francisco Superior Court
400 McAllister Street
San Francisco, CA 94102**

**CGC-25-625796**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
**Richard Hurlburt 179072 LEGAL ASSISTANCE TO THE ELDERLY
1663 Mission St Ste 225 (415) 538-3333
San Francisco, CA 94103**

| DATE: *(Fecha)* | **06/02/2025** | Clerk, by *(Secretario)* | **SHENEGUA GLADNEY** | , Deputy *(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* WELLS FARGO & COMPANY
   under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

CEB | Essential
ceb.com | Forms

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

Thomas E. Drohan, SBN 160008
Richard Hurlburt, SBN 179072
LEGAL ASSISTANCE TO THE ELDERLY
1663 Mission Street, Suite 225
San Francisco, CA 94103
phone: (415) 757-4531
email: rhurlburt@laesf.org

Attorneys for Plaintiff, LAVONNE ATKINS

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**05/30/2025**
**Clerk of the Court**
BY: SHENEQUA GLADNEY
Deputy Clerk

SUPERIOR COURT - STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO - UNLIMITED CIVIL JURISDICTION

| | | |
|---|---|---|
| LAVONNE ATKINS, | ) | No. |
| Plaintiff, | ) | |
| vs. | ) | **COMPLAINT**    CGC-25-625796 |
| WELLS FARGO NATIONAL | ) | |
| ASSOCIATION, WELLS FARGO | ) | |
| & COMPANY, and DOES 1-50, | ) | |
| Defendants. | ) | |

Plaintiff LAVONNE ATKINS alleges:

1. The Federal Trade Commission describes "imposter scam" as when a scammer lies and pretends to be someone they're not, to trick you into giving them money, access to your financial accounts, or your personal information. Scammers often pretend to be from a business you know or from a government agency, or both. They gain your trust and get you to believe they are who they claim to be. A "move your money imposter scam" involves the scammers saying they've discovered fraudulent or criminal activity, and convincing you to move money from your bank, investment, or retirement account.

2. The scam in this case began in July 2024. Plaintiff LAVONNE ATKINS was 87 years old. She had banked with Wells Fargo for five decades, having opened a checking account when she moved to San Francisco in 1974.

-1-

1     3. At all pertinent times, plaintiff was a senior citizen with cognitive decline, and was
2   substantially more vulnerable to undue influence than other members of the public due to her
3   age. Plaintiff is hard of hearing and wears hearing aids. She turns her head to one side and leans
4   forward to hear a person speaking to her. She suffers from shaking hands (essential tremors) to
5   the point that she can barely write, and uses her other hand to stabilize the hand she writes with.
6   The tremors are always there, and more pronounced when she is nervous or feeling under
7   pressure.

8     4. Defendant, WELLS FARGO NATIONAL ASSOCIATION (or "Wells Fargo, N.A.")
9   was founded in 1852 and is headquartered in San Francisco. It now operates over a dozen
10   branches in San Francisco. It is a subsidiary of defendant, WELLS FARGO & COMPANY, one
11   of the "Big Four Banks" in the United States. Plaintiff is informed and believes and thereon
12   alleges these two entities are agents of one another. Plaintiff refers to these two entities
13   collectively throughout this complaint as "Wells Fargo." Plaintiff refers to the two entities and
14   all their officers and employees collectively as "Team Wells Fargo."

15     5. Financial institutions including Wells Fargo are recognized throughout the financial
16   services industry, by state and federal government organizations, trade associations and
17   defendants themselves as the vital last line of defense against elder financial exploitation,
18   because they have ongoing relationships with their customers, often meeting them face-to-face,
19   and they have a wealth of information about the customers banking history.

20     6. The Financial Crimes Enforcement Network is a bureau of the U.S. Department of the
21   Treasury dedicated to combating financial crimes. FinCEN collaborates with bank regulatory
22   agencies such as the Federal Reserve, the Office of the Comptroller of the Currency, the Federal
23   Deposit Insurance Corporation and the Office of Thrift Supervision. Since 2011 FinCEN has
24   been issuing Advisories to alert financial institutions of elder financial exploitation targeting
25   older adults. These Advisories are widely distributed and known among employees of U.S.
26   financial institutions, including Wells Fargo. The most recent Advisory, dated June 15, 2022,
27   includes this information:
28   //

-2-

Complaint

Older adults are targets for financial exploitation due to their income and accumulated life-long savings, in addition to the possibility that they may face declining cognitive or physical abilities, isolation from family and friends, lack of familiarity or comfort with technology, and reliance on others for their physical well-being, financial management, and social interaction. The COVID-19 pandemic exacerbated these vulnerabilities for many older adults.

**Financial institutions are uniquely situated to detect possible financial exploitation through their relationships with older customers. They therefore play a critical role in helping to identify, prevent, and report EFE to law enforcement and their state-based Adult Protective Services, and any other appropriate first responder as well as assessing older customers who fall victim to financial exploitation.**
[emphasis added]

7. The 2022 Advisory goes on to identify specific behavioral and financial "Red Flags" of Elder Financial Exploitation (EFE) including:

- An older customer with unexplainable or unusual account activity.

- An older customer unable to answer basic questions about account activity.

- During a transaction, an older customer appears to be taking direction from someone with whom they are speaking on a cell phone.

- Uncharacteristic, sudden abnormally frequent, or significant withdrawals of cash from an older customer's account.

- Sudden non-sufficient fund activity.

- Frequent large withdrawals.

8. In recognition of its critical role in identifying, preventing and reporting elder financial exploitation, WELLS FARGO, N.A. has instituted policies and procedures designed to identify and counteract elder financial exploitation of its customers. These policies and procedures include but are not limited to the areas of employee training and awareness, advanced monitoring and detection, and customer engagement and preventative measures.

9. All customer-facing employees at Wells Fargo, N.A. undergo annual training to recognize and respond to signs of elder financial abuse. The training includes how to identify industry standard "Red Flag" hallmark indicators of elder financial exploitation, and emphasizes the "negotiate, isolate, and tattle" approach, encouraging staff to delay suspicious transactions, isolate the customer from potential abusers, and report concerns to appropriate authorities.

-3-

Docusign Envelope ID: 597UEE99-8509-4B9A-AF62-C35CC25D6418

1    10. Defendant Wells Fargo, N.A is a member of the American Banking Association and

2    enrolled in the ABA's Frontline Compliance Program. Front line Wells Fargo employees take the

3    ABA's Frontline Compliance Training Course and learn, *inter alia*, to:

4        ● Identify possible elder financial exploitation, including internet and mail fraud

5    schemes against elderly customers.

6        ● Explain why older individuals are vulnerable to financial exploitation.

7        ● Describe the role banks play in recognizing and reporting possible signs of elder

8    financial exploitation.

9    11. Defendant WELLS FARGO, N.A is a member of the California Banking Association.

10   The CBA's continuing education course on elder financial exploitation is recommended for all:

11   compliance officers, BSA officers, trainers, branch managers, branch staff, lenders, marketing,

12   and bank management. Customer-facing Wells Fargo employees take the CBA EFE course and

13   learn, *inter alia*, to:

14       ● Explain why financial professionals are the "watchdogs" for exploitation.

15       ● Tips for recognizing signs of diminished capacity.

16       ● Identify Red Flags for elder financial exploitation.

17   12. These courses provided by the American Banking Association and the California

18   Banking Association satisfy continuing education requirements Wells Fargo and other customer-

19   facing financial services industry employees are required to satisfy.

20   13. According to the FinCEN Interagency Statement on Elder Financial Exploitation, last

21   updated December 4, 2024, all U.S. financial institutions, including Wells Fargo, are encouraged

22   by federal agencies (including FinCEN, the OCC, the Federal Reserve Board, the NCUA, and

23   the FDIC) to adopt "internal controls, employee codes of conduct, ongoing transaction

24   monitoring practices, and complaint processes to identify, measure, control, and mitigate

25   financial exploitation."

26   14. All officers and employees of financial institutions, including Wells Fargo, are

27   mandated reporters of suspected financial abuse of elders. (Calif. Wel. & Inst. Code § 15630.1)

28   //

Docusign Envelope ID: 597DEE99-85D9-4B9A-AF82-C35CC25D6418

15. On July 24, 2024 at about 8:40 a.m. plaintiff's computer froze. The screen turned blue and indicated her identity had been stolen and provided an emergency number for Microsoft. Plaintiff previously had a frustrating experience with Microsoft where she was permanently locked out of her computer because she didn't have a code for Bitlocker, and lost years of files. Plaintiff called the number and was referred to Mike Dawson at "Wells Fargo" 805-206-2280. "Mr. Dawson" told her there were two attempts to transfer money from her Wells Fargo account, one for $4,300 and one for $7,100. He asked if she was trying to make the transfers. Plaintiff had actually attempted to transfer $4,300, but it didn't work. She had not attempted to make a $7,100 transaction. "Mr. Dawson" convinced plaintiff someone had stolen her identity and was trying to steal her money and it was his job to help her prevent the theft of her life savings.

16. Plaintiff received on her desktop a copy of an "Authorization Letter" drawn on official looking stationary from the "Board of Governors of the Federal Reserve System," authorizing Michael Dawson to act as "Investigation Officer in correspondence and representation of all approvals and matters required with all holding for Wells Fargo and Other Financial Institutions of LaVonne M. Atkins." Plaintiff believed "Mr. Dawson" was a Wells Fargo representative who was trying to help her. He convinced her to withdraw $17,000 in cash, nearly all the money she had in her Wells Fargo account.

17. On July 24, 2024 plaintiff went to the Wells Fargo branch on Chestnut Street. She spoke face-to-face with Cody, a teller, and another Wells Fargo employee, a woman who stepped in for Cody. Plaintiff attempted to withdraw $17,000 but the woman asked plaintiff what the money was for. "Mr. Dawson" was on the telephone with plaintiff and instructed her to say the money was for a house for her son. The woman did not believe the story and knew plaintiff was a fraud victim. She declined to authorized the $17,000 withdrawal but did authorize a withdrawal of $5,000. The Wells Fargo employees at the Chestnut branch could plainly see plaintiff was elderly. They were trained to recognize the signs she was presenting, multiple Red Flag hallmarks of elder financial exploitation, including: elderly person, suddenly attempting to empty her account by making a large cash withdrawal, quite atypical of her previous banking

Docusign Envelope ID: 597UEE99-6509-4B9A-AF62-C35CC25D6416

1    behavior, dubious story, on the phone with someone while she was at the bank. Yet Team Wells

2    Fargo turned a blind eye, elected not to ask any more questions or take any remedial action.

3    Instead, they chose to enable the fraud against plaintiff in the lesser amount of $5,000, full well

4    knowing the fraud perpetrator(s) would profit from the scam.

5         18. Later on July 24, 2024 plaintiff went to the Wells Fargo branch on Union Street.

6    There, she again presented multiple Red Flag indicators she was a victim of financial elder

7    abuse, such as: obviously elderly, making a large cash withdrawal, emptying her account,

8    behavior atypical of her previous longstanding banking practices, having a person on the phone

9    with her while she made the withdrawal. These signs were so obvious to the teller and branch

10   manager, who are trained to recognize such warning signs, that they must have known and did

11   know plaintiff was a victim of financial elder abuse. Team Wells Fargo knew their assistance

12   would harm plaintiff, benefit the scammer(s) and enable the fraud to occur. They processed the

13   withdrawal without question and handed their 87-year old customer $12,000 in cash.

14        19. At some point on July 25, 2024 "Mr. Dawson" told plaintiff someone was trying to

15   change the password on her Charles Schwab account, so he transferred her to David Cooper 206-

16   317-1566. "Mr. Cooper" explained that her money was at grave risk and she needed a safe place

17   to put her money because someone had stolen her identity. He recommended and then set up for

18   her a "TreasuryDirect account." On July 25, 2024 plaintiff received an email from

19   TREASURY.DIRECT@fiscal.treasury.gov. The email thanked her for opening a TreauryDirect

20   account, provided her new account number, and explained how to log in to her new account.

21        20. "Mr. Cooper" put plaintiff in touch with a Taylor Mason 424-458-1169. "Ms.

22   Mason" worked for the fraud department at Wells Fargo and explained how they had a problem

23   with someone on the inside and they needed to secure her funds. Plaintiff believed "Mr. Cooper"

24   and "Ms. Mason" were representatives of Charles Schwab and Wells Fargo, and were helping

25   her protect the money she had saved all her life.

26        21. These scammers (aka fraud perpetrators) Dawson, Cooper & Mason, convinced

27   plaintiff her identity had been stolen and her money was at grave risk in her Wells Fargo and

28   Charles Schwab accounts. She had never mentioned she kept her money at Wells Fargo and

-6-

Docusign Envelope ID: 597DEE99-6509-469A-AF62-C39CC25D6418

1  Charles Schwab. They already knew that. Plaintiff was convinced her money was not safe, and

2  she needed to move the money to safety at TreasuryDirect. On the instruction of the scammers,

3  plaintiff transferred funds from her Schwab account to her Wells Fargo account: $180,000 on

4  July 30, 2024, $32,009.38 and $213,093.13 on August 9, 2024.

5       22. During the next 10 days from July 25 to August 9, 2024, frightened, alone, 87-years

6  old,  and completely under the spell of the scammers, Ms. ATKINS went to local Wells Fargo

7  branches. Some she visited multiple times. Each time she spoke face-to-face with one or more

8  Wells Fargo employees, always presenting multiple Red Flag hallmark indicators that she was a

9  victim of financial elder exploitation, including but not limited to: obviously senior customer,

10  long account history of low volume transactions, suddenly making repeated quick succession

11  atypical large cash withdrawals, and having a person on the phone during the transactions. The

12  front line employees at Wells Fargo, all trained to recognize those very Red Flags and how to

13  react ("negotiate, isolate and tattle"), all full-well knowing their elderly customer was being

14  exploited for her money, chose to let the fraud occur. They saw her Red Flags and her shaking

15  hands. They looked into their computers at her account history. They chose not to see what they

16  knew was true. They didn't ask questions, didn't make suggestions, they didn't escalate or call

17  the fraud department or law enforcement or APS. They remained willfully blind and overlooked

18  the exploitation they must have known was happening. By August 9 they had placed another

19  $240,000 into the shaking hands of their 50-year customer, an 87-year old widow, $30,000 at a

20  time, without question; all the while knowing they were assisting the fraud perpetrator(s),

21  facilitating and enabling the fraud to continue.

22       23. Each time plaintiff went in to a branch to make a withdrawal the teller would enter

23  information into a computer and look at the computer screen. Plaintiff is informed and believes

24  and thereon alleges that during each transaction, the teller was able to see and did see plaintiff's

25  account history, including recent transactions made at other Wells Fargo branches.

26       24. For several years, probably decades, and perhaps never before had plaintiff made a

27  large withdrawal of cash from her account. In the two years prior to July 2024 her average total

28  withdrawals/debits were only $5,766 per month.

| Date | Amount | Form | Well Fargo Branch | Teller |
|---|---|---|---|---|
| 07/24/2024 | $ 5,000.00 | loose currency | 2100 Chestnut 021-25 | Cody |
| 07/24/2024 | $ 12,000.00 | loose currency | 076-21 | Maya |
| 07/30/2024 | $ 30,000.00 | loose currency | 076-23 | Jose |
| 07/30/2024 | $ 30,000.00 | loose currency | 1560 Van Ness 307-26 | Alfredo |
| 07/31/2024 | $ 30,000.00 | loose currency | 1900 Union | |
| 07/31/2024 | $ 30,000.00 | loose currency | 012-20 | Brian |
| 08/01/2024 | $ 30,000.00 | loose currency | 076-23 | Jose |
| 08/01/2024 | $ 30,000.00 | loose currency | 2100 Fillmore 012-28 | Cody |
| 08/09/2024 | $ 30,000.00 | loose currency | 012-20 | Brian |
| 08/09/2024 | $ 30,000.00 | loose currency | 1900 Union 076-20 | Raoo |
| **TOTAL:** | $ 257,000.00 | | | |

25. Each day Plaintiff returned home on the bus, and handed bags of cash to young men who showed up outside the apartment building where she lives. These men were couriers for the fraud perpetrators, DOES 21-50.

26. Plaintiff is informed and believes and thereon alleges that Wells Fargo, N.A. employs advanced monitoring software and machine learning models developed by data scientists to analyze transaction patterns and identify anomalies indicative of elder financial abuse. These models identify transactions that deviate from a customer's typical behavior and identify accounts of elder financial abuse victims. Plaintiff is further informed and believes and thereon alleges that said software identified her account activity as atypical and indicated financial exploitation was occurring, another way defendants knew their conduct was assisting the exploitation of plaintiff to the benefit of the third party fraud perpetrator(s).

27. On August 12, 2024 plaintiff entered a Wells Fargo branch and purchased a $99,000 bank draft. Although the branch did issue the check and hand it to plaintiff, one or more Wells Fargo representative(s) finally did the right thing. They apparently contacted law enforcement, which arranged with UPS to intercept the check and return it to plaintiff.

-8-

28. At all pertinent times all employees of Wells Fargo were acting within the course and scope of their employment and with the full knowledge, permission, and consent of Wells Fargo.

29. Plaintiff does not at this time know the identity or facts concerning the liability of DOE defendants 1-50. DOE defendants 1-20 are Wells Fargo employees who, at all pertinent times, worked and did business in San Francisco, California.

30 All employees of WELLS FARGO, N.A. were agents of WELLS FARGO & COMPANY. All Team Wells Fargo defendants and DOES 1-20 were at all pertinent times agents of one another. All DOE defendants 21-50 were agents of one another.

31. It was obvious to every front line Wells Fargo employee who spoke face-to-face with plaintiff that she was a victim of elder financial exploitation. Plaintiff exhibited multiple "Red Flag" hallmarks identifying her as being a victim of elder financial abuse, signs Wells Fargo and its employees are trained to recognize, including but not limited to: clearly an elder and a longstanding customer, suddenly draining her account; radical unexplained changes in banking behavior; multiple rapid succession large cash withdrawals; being on the phone while at the bank. Defendants must have known and did actually know plaintiff was a victim of elder financial abuse.

32. Despite plaintiff's highly unusual behavior and banking transactions, Team Wells Fargo failed to take reasonable action, such as: interviewing plaintiff about her situation, and asking plaintiff for the name of a trusted contact; contacting plaintiff's POD whose name was on the account; delaying the transactions; flagging the account for EFE review; escalating the matter to operations or Wells Fargo fraud prevention; inviting plaintiff to speak with a bank manager; suggesting plaintiff speak with law enforcement; handing plaintiff written materials identifying common elder financial scams and providing phone numbers of law enforcement agencies she could call for help; reporting the unusual activity to Adult Protective Services; reporting the matter to law enforcement; and/or putting a temporary hold on plaintiff's account. Team Wells Fargo took none of the actions reasonably within their power to prevent the crime being committed.

//

Docusign Envelope ID: 597CEE99-8509-4B9A-AF62-C35CC25D6418

1    33. Instead, Team Wells Fargo elected to enable the fraud. Team Wells Fargo made

2    conscious choices, over and over again, to overlook the multiple Red Flags identifying plaintiff

3    as a fraud victim, and hand their 87-year old customer $30,000 in $100 bills, full well knowing

4    they were enabling a fraud and assisting in her financial exploitation, knowing substantial harm

5    would come to plaintiff, and the scammers defrauding plaintiff would get her money.

6    Team Wells Fargo's assistance, as described herein, was a substantial factor in causing plaintiff

7    to lose $257,000.

8                              **FIRST CAUSE OF ACTION**

9            **(Elder Financial Abuse, Welfare & Institutions Code § 15600, et seq.)**

10                              **Against All Defendants**

11    34. Plaintiff incorporates in this cause of action the allegations of paragraph Nos. 1-33

12    35. Plaintiff was at all times an "elder" as defined by California Welfare and Institutions

13    Code § 15610.27. As an "elder" plaintiff is entitled to the heightened rights and special statutory

14    protections afforded under the Elder and Dependent Adult Civil Protection Act (EADACPA), set

15    forth at Welfare and Institutions Code § 15600 et seq.

16    36. Under Welfare and Institutions Code § 15610.30(a) "financial abuse" of an elder or

17    dependent adult occurs when a person or entity does any of the following: (1) Takes, secretes,

18    appropriates, obtains, or retains real or personal property of an elder or dependent adult for a

19    wrongful use or with intent to defraud, or both. (2) Assists in taking, secreting, appropriating,

20    obtaining or retaining real or personal property of an elder or dependent adult for wrongful use

21    or with intent to defraud, or both.

22    37. DOE defendants 21-50 took, secreted, appropriated, or obtained the property of

23    plaintiff, committing multiple violations of § 15610.30(a)(1). WELLS FARGO, N.A., WELLS

24    FARGO & COMPANY, and DOE defendants 1-20 assisted in the taking, secreting,

25    appropriating, obtaining the personal property of an elder for a wrongful use or with the intent to

26    defraud, committing multiple violations of § 15610.30(a)(2). All said violations were substantial

27    factors in causing damages to plaintiff.

28    //

                                        -10-

Docusign Envelope ID: 597DEE99-850D-4B9A-AF62-C3DCC25D6418

38. As described in this Complaint, WELLS FARGO, N.A., WELLS FARGO & COMPANY, and DOE defendants 1-20 assisted in the taking, secreting, appropriating, obtaining or retaining real or personal property of plaintiff for wrongful use or with intent to defraud, or both; and thus committed financial elder abuse under Welfare and Institutions Code § 15610.30, *inter alia,* because they actually knew one or more fraud perpetrators were engaging in financial elder abuse of plaintiff, and that their conduct in processing plaintiff's requests for large cash withdrawals, without question, in the face of multiple Red Flag hallmark signs identifying plaintiff as a victim of elder financial exploitation, was assisting the fraud perpetrators carry out their crime(s). The acts and omissions of these defendants, in the context of all the facts alleged above, demonstrate defendants must have known when they were processing repeated quick succession large cash withdrawals from their 87-year-old customer's account, that she was a fraud victim, and the withdrawals would harm plaintiff and benefit the fraud perpetrator(s). Team Wells Fargo thus knowingly and intentionally aided, facilitated and promoted the fraud being perpetrated on plaintiff.

39. Despite Team Wells Fargo's actual knowledge they were enabling and assisting criminal(s) perpetrating a fraud in order to steal plaintiff's life savings, they assisted in these large cash withdrawals over and over again. Defendants' conduct, described herein, was a substantial factor in causing harm to plaintiff. But for the repeated assistance defendants provided, the damages to plaintiff would not have occurred.

40. Beginning with the first cash withdrawal on July 24, 2024 when the Wells Fargo employee recognized the fraud was occurring and chose to assist with a $5,000 cash withdrawal, after declining to process the $17,0000 withdrawal the scammers had instructed plaintiff to request, defendants knew they were assisting a fraud. Over the next sixteen days the scammers sent plaintiff to Wells Fargo ten times to make large cash withdrawals. For nine of those ten times Team Wells Fargo turned a blind eye and chose not to react to the obvious facts, that any front line banker would have seen and what Team Wells Fargo were trained to recognize and did actually recognize in their face-to-face transactions with plaintiff, and from the glaring

//

-11-

Complaint

Docusign Envelope ID: 597DEE99-B5D9-4B9A-AF62-C35CC25D6418

1   abnormality of her account transactions: multiple Red Flag hallmarks identifying plaintiff as a

2   victim of elder financial abuse.

3        41. The acts and omissions of defendants, alleged above, were a substantial factor in

4   causing damages to plaintiff. Such damages include but are not limited to: economic damages of

5   $257,000 as well as mental distress, shame, humiliation, fear, anxiety, anguish, depression,

6   physical injury and likely a shortened life span; all to her general damage in an amount to be

7   established according to proof.

8        42. Due to the conduct, acts and omissions of defendants, and each of them, as alleged

9   above, plaintiff is entitled to recover reasonable attorney fees and costs under Welfare and

10  Institutions Code § 15657.5.

11       43. Despite being uniquely positioned to identify and counteract the elder financial abuse

12  they knew was being perpetrated against plaintiff, Team Wells Fargo overlooked the abuse and

13  assisted the fraud perpetrator(s) because, profits. Wells Fargo profits by looking the other way.

14  By asserting this "willful blindness" and allowing the financial exploitation to occur, Wells

15  Fargo makes money from increased monthly account fees, increased fees for wire transfers, and

16  increased overdraft fees (including three $35 overdraft fees plaintiff suddenly incurred on

17  August 5 & 6, 2024). By pretending not to see financial abuse Wells Fargo's profits are

18  substantially increased by saving from spending time doing all the things they could do and

19  should do to prevent their elderly customers losing their life savings.

20       44. Defendants' conduct, acts and omissions carried out with oppression, fraud, and

21  malice as defined in Civil Code § 3294. Defendants' conduct was so unreasonable that

22  defendants knew  it was highly probable that substantial harm would result to plaintiff. The facts

23  alleged above show recklessness and a disregard for the high probability of injury to plaintiff.

24  Plaintiff is thereby entitled to recovery damages for the sake of example and to punish

25  defendants under Civil Code § 3294.

26  //

27  //

28  //

-12-

Complaint

## SECOND CAUSE OF ACTION

### (Unfair & Unlawful Business Practices, Business & Prof. Code § 17200, et seq.)

### Against Defendants WELLS FARGO, N.A., WELLS FARGO & COMPANY, and DOES 21-50.

45. Plaintiff incorporates in this cause of action the allegations of paragraph Nos. 34-44.

46. Plaintiff was 87 years old at the time of the scam. Like so many seniors, plaintiff was unable to reasonably avoid becoming a subject of the fraud perpetrated upon her. Seniors are highly susceptible to fraud, as reflected, *inter alia*, in the enactment of the Calif. Financial Elder Abuse Law and the 2022 FinCEN Advisory.

47. Defendants WELLS FARGO, N.A. and WELLS FARGO & COMPANY financially abused plaintiff when they knowingly assisted the fraud perpetrators in obtaining $257,000 of plaintiff's money, nearly all her life savings.

48. The scammer(s) did to plaintiff what they do to many seniors. They gained her trust over an extended period and exploited it. Defendants' business practice of processing suspicious large cash withdrawals from seniors without inquiry and without taking preventative action presented inherent unfair risks to plaintiff, which were the direct and proximate result of substantial damages to plaintiff.

49. Such willful blindness is tantamount to actual knowledge. (<u>Glob.-Tech Appliances, Inc. v. SEB S.A.</u> (2011) 563 U.S. 754, 766; <u>Levy v. Irvine</u> (1901) 134 Cal. 664, 672) Defendants' practice constitutes business practices unfair to plaintiff, unfair to other senior citizen customers of defendants, and to other financial institutions competing with defendants.

50. Business & Professions Code § 17200 et seq. prohibits any person from engaging in unfair competition as defined at B& P § 17200, which includes any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with § 17500) of Part 3 of Division 7 of the Business & Professions Code.

51. Defendant DOES 21-50 violated Welfare and Institutions Code § 15610.30 when they took, secreted, appropriated, obtained or retained plaintiff's funds for a wronful use or with an intent to defraud or both.

-13-

Complaint

1    52. Defendants WELLS FARGO, N.A. and WELLS FARGO & COMPANY violated

2  Welfare & Institutions Code § 15610.30 when they assisted in the taking, secreting,

3  appropriating, obtaining or retaining of plaintiff's funds, $257,000, for a wrongful use or with an

4  intent to defraud, or both, and when they took and retained overdraft fees from plaintiff she

5  incurred as part of the fraud. Plaintiff thus has a right to restitution under Business & Professions

6  Code § 17200.

7    53. As a direct and proximate result of Wells Fargo's unfair and unlawful business

8  practices, as alleged herein, plaintiff has suffered injury in fact and lost money or property.

9    54. Plaintiff requests this Court enter such orders or judgments as may be necessary to

10  compel defendants to restore to plaintiff any money or property acquired by means of such unfair

11  competition.

12    55. Plaintiff further requests the Court enjoin defendants from the unlawful and unfair

13  practices described above.

14    **Wherefore, plaintiff prays for relief as follows:**

15    a.  general damages,

16    b.  special damages,

      c.  statutory damages,

17    d.  treble damages under Civil Code § 3345,

18    e.  restitution under B & P § 17203,

      f.  injunctive relief under B & P § 17203,

19    g.  punitive and exemplary damages,

20    h.  reasonable attorney fees.

21    i.  costs of suit,

      j.  prejudgment interest according to law, and

22    k.  such other relief the Court deems just & proper.

23

24                                  LEGAL ASSISTANCE TO THE ELDERLY

25  Dated: May 30, 2025

26                                  By: Richard Hurlburt
                                        Attorneys for plaintiff,
27                                      LAVONNE ATKINS

28

                                       -14-

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

| | | |
|---|---|---|
| **DATE:** | **OCT 29, 2025** | |
| **TIME:** | **10:30 am** | |
| **PLACE:** | **Department 610** | |
| | **400 McAllister Street** | |
| | **San Francisco, CA 94102-3680** | |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

### ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION, AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

**(SEE LOCAL RULE 4)**

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400 McAllister Street, Room 103-A**
**San Francisco, CA 94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**



**Superior Court of California, County of San Francisco**
**Information Sheet**
**Voluntary Expedited Jury Trial Summary**

The San Francisco Superior Court encourages the use of Voluntary Expedited Jury Trials ("EJTs") in appropriate cases. EJTs provide an excellent opportunity to resolve your client's case in an expeditious and inexpensive way. Voluntary EJTs are authorized by statute. CCP §§ 630.01.

EJTs can resolve your entire case <u>or</u> a single important case critical issue that, once adjudicated, can promote resolution of the entire case (for example: course and scope of employment, causation of an injury, whether a contract was formed, etc.) EJTs promote equal access to civil justice as they are less expensive, consume fewer courtroom days, provide flexibility throughout, encourage high/low agreements to limit risk, and feature streamlined pre-trial procedures.

These are highlights of an EJT (C.C.P. §§ 630.01 et seq. and Rules of Court 3.1549 - 3.1553):

- Parties encouraged to submit a joint jury questionnaire;

- 8 jurors (6 must agree);

- 3 peremptory challenges per side;

- 5-hour time limit per side <u>unless agreed otherwise and approved;</u>

- One to two court days completion <u>unless agreed otherwise and approved;</u>

- Option to present evidence by stipulation and objection;

- High/low arrangement option;

- Limited appeal (misconduct by judge or jury substantially affecting parties' rights or corruption, or bad faith.)

If the parties agree to the Voluntary EJT, they should file and serve the completed and signed (Proposed) Consent Order for Voluntary Expedited Jury Trial, Judicial Council Form EJT-020.



# Superior Court of California, County of San Francisco
## Alternative Dispute Resolution
## Information Package



> The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action together with the cross-complaint. (CRC 3.221(c).)

## WHAT IS ADR?

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to trial.

## WHY CHOOSE ADR?

It is the policy of the Superior Court that every long cause, non-criminal, non-juvenile case should participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial. (Local Rule 4.)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

**\*\*Electing to participate in an ADR process does not stop the time period to respond to a complaint or cross-complaint\*\***

## WHAT ARE THE ADR OPTIONS?

The San Francisco Superior Court offers different types of ADR processes for general civil matters. The programs are described below:

## 1) MANDATORY SETTLEMENT CONFERENCES

Settlement conferences are appropriate in any case where settlement is an option. The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute. Mandatory settlement conferences are ordered by the court and are often held near the date a case is set for trial, although they may be held earlier if appropriate. A party may elect to apply to the Presiding Judge for a specially set mandatory settlement conference by filing an ex parte application. See Local Rule 5.0 for further instructions. Upon approval by the Presiding Judge, the court will schedule the conference and assign a settlement conference officer.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF):** The ADR DEPARTMENT OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF), in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. BASF's panel of experienced, professional and impartial mediators work with parties to help them arrive at mutually agreeable solutions. Parties can select their mediator from the website www.sfbar.org/mediation or BASF can assist with mediator selection. BASF pre-screens all mediators based upon strict educational and experience requirements and handles administrative matters, including conflict checks and case management. BASF charges an initial fee of $295 per party, which covers (1) BASF's administration costs, (2) the first hour of preparation time, and (3) the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate, which varies depending on the mediator selected. Waivers of BASF's fee are available to those who qualify. For more information, call 415-982-1600 or email adr@sfbar.org.

**(B) JUDICIAL MEDIATION PROGRAM** provides mediation with a San Francisco  Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional  malpractice, insurance coverage,  toxic torts and industrial accidents. Parties may utilize this program at any time throughout the litigation process. Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program.  A preference for a specific judge may be indicated.  The court will coordinate assignment of cases for the program.  There is no charge. Information about the Judicial Mediation Program may be found by visiting the ADR page on the court's website: www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may select any private mediator of their choice. The selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

**(D) COMMUNITY BOARDS MEDIATION SERVICES:** Mediation services are offered by Community Boards (CB), a nonprofit resolution center, under the Dispute Resolution Programs Act. CB utilizes a three-person panel mediation process in which mediators work as a team to assist the parties in reaching a shared solution. To the extent possible, mediators are selected to reflect the demographics of the disputants. CB has a success rate of 85% for parties reaching a resolution and a consumer satisfaction rate of 99%. The fee is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available. For more information, call 415-920-3820 or visit communityboards.org.

## 3) ARBITRATION

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

### (A) JUDICIAL ARBITRATION

When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.1 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after being assigned to judicial arbitration. There is no cost to the parties for judicial arbitration.

### (B) PRIVATE ARBITRATION

Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

## HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's or court-affiliated ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet and available on the court's website); or
- Indicating your ADR preferences on the Case Management Statement (available on the court's website); or
- Contacting the court's ADR Department (see below), the Bar Association of San Francisco's ADR Services, or Community Boards.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
adrcoordinator@sftc.org
Or, visit the court's ADR page at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE AND FILE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF OR COMMUNITY BOARDS TO ENROLL IN THEIR LISTED PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF OR COMMUNITY BOARDS.

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name *and address*)

FOR COURT USE ONLY

TELEPHONE NO.:

ATTORNEY FOR (Name):

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: _____ |
| | DEPARTMENT 610 |

1) . **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Mediation Services of Community Boards (CB)** – Service in conjunction with DRPA, CB provides case development and one three-hour mediation session. Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available to those who qualify. communityboards.org

☐ **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution

☐ **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days ☐ 90-120 days ☐ Other (please specify) _____

☐ **Other ADR process** (describe) _____

2) The parties agree that the ADR Process shall be completed by (date): _____

3) Plaintiff(s) and Defendant(s) further agree as follows:

_____

_____
Name of Party Stipulating                                  Name of Party Stipulating

_____
Name of Party or Attorney Executing Stipulation            Name of Party or Attorney Executing Stipulation

_____
Signature of Party or Attorney                             Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant        ☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____                          Dated: _____

☐ *Additional signature(s) attached*

ADR-2  04/24                    **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**